USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: March 17, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SHEILA LIOTARD,                                    :
                                                   :
                        Plaintiff,                 :              14-cv-2083 (NSR)
        -against-                                  :
                                                   :              OPINION & ORDER
                                                   :
FEDEX CORPORATION,                                 :
FEDEX FREIGHT CORPORATION,                         :
 and FEDEX FREIGHT, INC.,                           :
                                                   :
                        Defendants.                :
-------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

        Sheila Liotard ("Plaintiff") asserts unlawful discrimination, harassment, and retaliation

on the basis of Plaintiff's gender in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII") and the New York State Human Rights Law ("NYSHRL"), and asserts unlawful

discrimination, harassment, and retaliation on the basis of Plaintiff's age in violation of Age

Discrimination in Employment Act of 1967 ("ADEA") and the NYSHRL. Before the Court is

Defendants' motion for summary judgment. For the following reasons, Defendants' motion is

GRANTED.

## FACTUAL BACKGROUND

        The following facts are not in dispute, unless so noted, and are derived from the parties'

summary judgment submissions. Defendant FedEx Freight Corporation ("FXF, Corp.") and

defendant FedEx Freight, Incorporated ("FXF, Inc.") (collectively, "Defendants") are separate

and distinct legal entities. (Plaintiff's Counterstatement of Material Facts and Statement of

Disputed Material Facts Pursuant to Local Civil Rule 56.1, "Pl.'s 56.1," ECF No. 41, ¶ 4.) FXF,

Inc. is a direct and wholly-owned subsidiary of FXF, Corp. (*Id.* ¶ 3.)

In or about 2007, Plaintiff responded to a job advertisement published in the Times Herald Record seeking cleaning professionals to work for Bright Horizons—a company that provides commercial office cleaning services for various corporate accounts. (*Id.* ¶ 34.) Bright Horizons is owned and operated by Douglas Lindberg. (*Id.* ¶ 22.) Shortly after responding to the advertisement, Plaintiff interviewed with Lindberg, and he offered her a position with Bright Horizons. (*Id.* ¶ 35.) At all times relevant to the Complaint—specifically April 2011 to June 2012—Plaintiff was employed by Bright Horizons. (*Id.* ¶¶ 23, 35, 41, 77, 94, 99.) During 2011 and 2012, Bright Horizons performed janitorial services for a FedEx facility in Montgomery, New York, which is referred to as FedEx's Newburgh Service Center ("NWB").[1] (*Id.* ¶¶ 5, 21.) FedEx's NWB facility is one of Bright Horizons' larger monetary accounts. (*Id.* ¶¶ 26, 98.) When Bright Horizons gets a new account, Lindberg arranges for an employee to service that account, though an employee could object to a placement if he or she was not interested in or was dissatisfied with the assignment. (*Id.* ¶ 27; Mullkoff Decl., ECF No. 42, Ex. 2, at 27:2-13, 28:6-29:2.) In April 2011, Lindberg requested that Plaintiff service the FedEx account, and Plaintiff began cleaning the NWB center. (*Id.* ¶ 41.)

The parties dispute the extent to which Plaintiff's work at NWB was covered and governed by a written Facilities Service Agreement (an "FSA"). (*Id.* ¶¶ 13-22.) FedEx uses FSAs to contract for third-party janitorial services. (*Id.* ¶¶ 11-12.) It is clear from the record that FXF, Inc. entered into two FSAs for general janitorial services with a third-party company, Brite Solutions, Inc. (a Tennessee-based entity), for the time period from October 2009 to October

---

[1] The parties dispute, and it is unclear from the record, which FedEx entity—FXF, Corp. or FXF, Inc.—owned and operated NWB. However, the Defendants' motion for summary judgment is granted because Plaintiff failed to provide evidence creating an issue of material fact as to whether FedEx—through either entity—was Plaintiff's joint employer. Therefore, the claims against both entities are dismissed, and the Court need not decide which entity Plaintiff is alleging is the functional employer.

2

2012. (*Id.* ¶¶ 13-14; Saccomano Aff., ECF No. 38, Exs. G, H.) Defendants contend that Bright *Horizons* serviced these FSAs under a subcontractor agreement. (Pl.'s 56.1, ¶ 21.) Plaintiff, however, points out that the only written subcontract agreement between Bright Horizons and Brite Solutions is dated June 1, 2012 and is therefore inapplicable to the time period at issue (2011-2012). (*Id.* ¶ 13; Saccomano Aff., Ex. I.) In addition, Lindberg only recalls signing one subcontractor agreement. (Pl.'s 56.1, ¶ 13; Mullkoff Decl., Ex. 2, at 52:6-24; 90:3-91:18.) The record is devoid of any subcontractor agreement applying before 2012; however, though Brite Solutions was in contract with FXF, Inc. to perform janitorial services from 2009 to 2012, Bright Horizons was the company performing such services from at least April 2011 to June 2012. (Pl.'s 56.1, ¶ 13.)

When Plaintiff began to work at the NWB center in April 2011, she was cleaning with the help of another employee and earning $125 per week. (*Id.* ¶ 43.) At some point later, Plaintiff became the only janitorial worker at the NWB center and was earning $250 per week. (*Id.* ¶¶ 44, 97.) Lindberg determines the rate of pay of Bright Horizons' employees based on the number of hours it will take to complete the cleaning services for that account, and employees are paid by check. (*Id.* ¶¶ 28-29.) Plaintiff was compensated by Bright Horizons and never received financial remuneration or benefits directly from FedEx. (*Id.* ¶ 46.) Plaintiff never received any paperwork from either FXF, Inc. or FXF, Corp., but she did observe and abide by a piece of paper posted by FedEx on the door of a utility closet next to the men's bathroom that listed rules about dress code and manners and that was addressed "to all personnel." (*Id.* ¶¶ 47, 114.)

After FedEx Service Center Manager William Ward made the determination that Plaintiff's cleaning must take place in the early morning, Lindberg directed Plaintiff to clean the NWB center Monday through Friday between 5:30 a.m. and 9:30 a.m. (*Id.* ¶¶ 49, 103.) Lindberg

3

advised Plaintiff that, as long as she completed the required cleaning tasks, she was not required to stay at the NWB center until 9:30 a.m.; rather, she was permitted to leave the NWB center whenever she finished the required tasks. (*Id.* ¶ 51.) At the outset of Plaintiff's assignment at NWB, Lindberg walked through the facility with her, pointing out areas that needed to be cleaned and tasks that needed to be completed. (*Id.* ¶ 52; Saccomano Aff., Ex. J, at 40: 1-12.) On rare occasions throughout Plaintiff's time at NWB, Ward would request that Plaintiff complete a cleaning task, and Plaintiff would do so. (Pl.'s 56.1, ¶¶ 55, 108; Mullkoff Decl., Ex. 2, at 49:9-50:18.) The parties dispute the extent to which Plaintiff viewed Ward as a customer or a boss, and Plaintiff has made references to him in both roles. (Pl.'s 56.1, ¶ 56; Saccomano Aff., Ex. K, at 71:7-72:17, 104:17-105:02; Mullkoff Decl., Ex. 3, at 104:20-24.)

Plaintiff very rarely observed Lindberg at the NWB facility. (Mullkoff Decl., Ex. 3, at 139:18-24.) Lindberg stays up-to-date on customer satisfaction by calling his clients directly and, once in a while, by visiting the facilities. (*Id.* ¶ 33.) On a few occasions, Lindberg brought cleaning supplies to NWB. (Pl.'s 56.1, ¶ 61.) Usually, though, Plaintiff would pick up supplies from Lindberg's home. (Mullkoff Decl., Ex. 3, at 140:15-24.) Bright Horizons provided Plaintiff with the majority of her cleaning supplies, but Plaintiff also used paper products (i.e., toilet paper, paper towels), gloves, and a vacuum that were provided by FedEx. (Pl.'s 56.1, ¶¶ 59, 112; Mullkoff Decl., Ex. 2, at 46:14-47:14; Mullkoff Decl., Ex. 3, at 140:15-141:7.)

In April 2011, on the third day of her assignment at the NWB center, Plaintiff told Lindberg about comments allegedly directed towards her by Edwin Vazquez, a Shop Technician, and Donald Smith, a Custodian, both employed by FXF, Inc. (Pl.'s 56.1, ¶ 63.) Plaintiff complained three additional times throughout the year, including her final complaint that was made to David Lemmond, a District Fleet Maintenance Manager for FXF, Inc. (*Id.* ¶¶ 64, 124,

4

127, 135.) At Lemmond's request, Plaintiff drafted a written statement about her complaint and

forwarded it to Christopher Weng, a Regional Fleet Maintenance Manager for FXF, Inc., who

then notified Brian Jenkins, a Human Resources Manager for FXF, Inc. (*Id.* ¶¶ 65-66.) FXF,

Inc.'s Equal Employment Opportunity / Non-Discrimination Policy and Procedure for

Complaints (the "Non-Discrimination Policy") provides that:

> The purpose of this policy is to help ensure that all employees and
> other individuals providing services to [FedEx] work in an
> environment free from unlawful discrimination, harassment, or
> other forms of physical violence, threats, and intimidation, where
> all employees can maximize productivity in their jobs. Unlawful
> discrimination, harassment, threatening behavior, or acts of
> violence against employees, applicants, customers, vendors or
> other service providers or other individuals while associated with
> [FedEx] will not be tolerated. Violations of this policy will lead to
> corrective action, which may include termination, arrest, and
> prosecution.

(Saccomano Aff. Ex. L, at 59). Further provisions of the policy only use the term "employee," as

opposed to including "other individuals providing services." (Pl.'s 56.1, ¶¶ 58, 143; Saccomano

Aff. Ex. L, at 60 (". . . Any employee who feels he or she is the victim of any of these behaviors

should report the conduct immediately to their immediate supervisor or the manager over their

department, and to the appropriate HR Advisor. . . .")); *id.* at 61 ("While verbal complaints or

reports will be accepted, in most cases an employee reporting these types of behavior will be

asked to make a written report . . . ."); *id.* ("A determination regarding the complaint will be

made and communicated to the employee as soon as possible."); *id.* ("Employees should report

any incidents of harassment, discrimination or retaliation forbidden by this policy so that

complaints can be thoroughly investigated and quickly resolved."); *id.* ("No retaliation will occur

because an employee has in good faith reported an incident or suspected discrimination or

harassment, or because of his or her part or cooperation in any resulting investigation. . . .".)

5

Plaintiff made her complaint to Lemmond on June 27, 2012, and on that same day or the following day, Jenkins called Plaintiff at her home to ask her about the concerns she raised. (*Id.* ¶¶ 69, 153.) Jenkins conducted an investigation regarding Plaintiff's complaint; interviewed three Shop Technicians; determined the technicians were credible; and ultimately concluded that he could not corroborate Plaintiff's complaint of inappropriate conduct. (*Id.* ¶¶ 70-73.) Jenkins then spoke with Lindberg about the complaint and investigation and asked Lindberg if he could reassign Plaintiff to another location. (*Id.* ¶¶ 76, 157; Mullkoff Decl., Ex. 5, at 180:14-24.) Because Jenkins did not want Plaintiff to return to NWB, Lindberg "took her out" of the facility and offered her new and different work. (*Id.* ¶¶ 77, 158; Saccomano Aff., Ex. J, at 82:5-14.) The parties dispute who made the ultimate decision to reassign Plaintiff and whether Lindberg sincerely offered to make Plaintiff a supervisor following the termination of her assignment at FedEx. (Pl.'s 56.1, ¶¶ 79-80, 165.) However, it is clear that "Lindberg assigned [Plaintiff] to clean a car dealership," Healey Chevrolet, after she stopped working at the FedEx facility. (*Id.* ¶¶ 79, 167.) Plaintiff ceased her work for Bright Horizons approximately two weeks later in or about July of 2012. (*Id.* ¶¶ 82, 169.)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by

"showing . . . that [the] adverse party cannot produce admissible evidence to support the fact."
Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to
the non-moving party to identify "specific facts showing that there is a genuine issue for trial."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks
omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable
jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F.
App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "constru[e] the evidence in the light
most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor."
*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal
quotation marks omitted). In reviewing the record, "the judge's function is not himself to weigh
the evidence and determine the truth of the matter," nor is it to determine a witness's credibility.
*Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of
determining whether there is the need for a trial." *Id.* at 250. The court's role at this stage of the
litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v.
Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Summary judgment should be granted when a party "fails to make a showing sufficient to
establish the existence of an element essential to that party's case, and on which that party will
bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is
genuinely disputed must support their assertion by "citing to particular parts of materials in the
record" or "showing that the materials cited do not establish the absence . . . of a genuine
dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with
conclusions, are insufficient to defeat a properly supported motion for summary judgment."
*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). The nonmoving party "may not

rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Moreover, "[a non-moving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

Defendants move for summary judgment on only one issue: whether Defendants were Plaintiff's "employer" within the meaning of anti-discrimination statutes. To be held liable under Title VII and the ADEA for unlawful practices, an employer-employee relationship must have existed between the parties at the time of the alleged harassment. *See Kern v. City of Rochester*, 93 F.3d 38, 44-45 (2d Cir. 1996). "It is generally recognized that the term 'employer,' as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054 (2d Cir. 1982), *vacated and remanded on other grounds*, 463 U.S. 1223 (1983) (internal citations and quotation marks omitted); *Laurin v. Pokoik*, No. 02 CIV. 1938 (LMM), 2004 WL 513999, at *4 (S.D.N.Y. Mar. 15, 2004) ("The term 'employer' has been construed liberally under Title VII, and does not require a direct employer/employee relationship. The term is construed under Title VII and the ADEA in the same way.") (internal citations and quotation marks omitted). Accordingly, the Second Circuit has recognized the joint employer doctrine, pursuant to which "an employee,

formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005).

A determination that a third-party entity is acting as joint employer requires "sufficient evidence of immediate control over the employees." *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985). The Second Circuit has identified five factors that bear on the "immediate control" inquiry: "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process." *AT & T v. NLRB*, 67 F.3d 446, 451 (2d Cir. 1995) (citing *Clinton's Ditch*, 778 F.2d at 138-39); *see also NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994) (per curiam) (in determining whether employers have "joint" status, courts consider "commonality of hiring, firing, discipline, pay, insurance, records, and supervision."). In the instant case, the control exercised over Plaintiff by FedEx falls short of the type of control necessary to establish a joint employer.

First, Plaintiff was clearly hired by Lindberg and Bright Horizons, rather than FedEx. It is undisputed that Plaintiff interviewed with Lindberg, and Lindberg offered her a position. From about 2007 to 2011, Plaintiff was assigned to a separate cleaning job through Bright Horizons, and she only came to work at FedEx's NWB center in 2011. While it may be unsettled whether Lindberg "assigned" Plaintiff to these cleaning jobs, it is clear that Lindberg requested that Plaintiff service the NWB center and she followed his instructions, thereby making it Lindberg's

9

decision where to place her. In addition, Plaintiff was compensated exclusively by Bright Horizons, based on Lindberg's determination of a proper rate of pay.

It is also clear that Defendants did not have the authority to fire the Plaintiff. Plaintiff argues that, in substance, it was Jenkins who made the decision to terminate Plaintiff's placement at NWB. Even drawing all inferences in Plaintiff's favor, at most, Jenkins could have terminated her *placement* at NWB; Plaintiff's *employment* with Bright Horizons continued. "[A]n entity that has the power to request that an employee be moved but not to cause her to be terminated is not a joint employer." *Conde v. Sisley Cosmetics USA, Inc.*, No. 11 CIV. 4010(RJS), 2012 WL 1883508, at *4 (S.D.N.Y. May 23, 2012). Plaintiff argues—and cites a number of cases to support the idea that—"an entity's ability even simply to request that the plaintiff be transferred is a relevant factor suggesting that the entity is a joint employer." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opposition"), ECF No. 40, at 19.) Although it is true an entity's ability to request a plaintiff be transferred is relevant and weighs in favor of a joint employer finding in some circumstances, the defendants in the cases that Plaintiff cites hold significantly more control over the hiring and firing decisions than Defendants in the instant case. *Compare Gonzalez v. Allied Barton Sec. Servs.*, No. 08 CIV 9291 RJS RLE, 2010 WL 3766964, at *3-4 (S.D.N.Y. Sept. 7, 2010) *report and recommendation adopted*, No. 08 CIV 9291(RJS)(JLE), 2010 WL 3766954 (S.D.N.Y. Sept. 27, 2010) (ruling on summary judgment that evidence that a defendant asked a plaintiff's direct employer to have her transferred after uncovering misconduct was insufficient to establish a joint employer relationship where the defendant had no say in hiring, did not pay the plaintiff, and did not have the final say over assignments), *with Jiggetts v. N.Y.C. Dep't of Citywide Admin. Servs.*, No. 11 Civ. 1245(PAC)(FM), 2012 WL 231566, at *7 (S.D.N.Y. Jan. 6, 2012) (declining to dismiss on

10

joint employment grounds where plaintiff alleged that the defendant, a city agency, had the right to interview security guards, reject proposed guards, request retraining or replacement of guards, and demand removal of guards), *adopted*, 2012 WL 614310 (S.D.N.Y. Feb. 27, 2012). The majority of Plaintiff's cited cases concern employees of temporary employment or staffing agencies and therefore are distinguishable. In the temporary employment context, "[a]t common law, the status of a person employed under such circumstances would be determined under the loaned servant doctrine, which provides that an employee directed or permitted to perform services for another 'special' employer may become that employer's employee while performing those services." *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344, 349 (S.D.N.Y. 1984) *aff'd sub nom. Aharnare v. Merrill Lynch*, 770 F.2d 157 (2d Cir. 1985) (internal citations and quotation marks omitted). When a temporary employee's placement ends, generally, the employee is no longer working or compensated, and the ending of the placement acts as a sort of constructive termination. In contrast, Plaintiff was performing janitorial services as an independent contractor, and her "placement" at the NWB facility is distinguishable from a loaned servant in the temporary employment context. In fact, Plaintiff was not "terminated" when her placement at NWB ended, which is evidenced by her quick reassignment to Healey Chevrolet, where she continued to work for Bright Horizons. *See Conde,* 2012 WL 1883508, at *4 ("as a practical matter, the Amended Complaint makes clear that [the defendant] at most had the power to stop Plaintiff from working in its store, while [the formal employer] could move Plaintiff or terminate her altogether."). Therefore, FedEx did not have any control over Plaintiff's "termination."

In addition, FedEx did not have control of Plaintiff's day-to-day activities.[2] Though FedEx supervisors occasionally directed Plaintiff to perform a task, the Second Circuit has found that such direction is "limited and routine" and is "typically insufficient to create a joint employer relationship." *Serv. Employees Int'l Union, Local 32BJ v. N.L.R.B.*, 647 F.3d 435, 443 (2d Cir. 2011). More specifically, where supervision "consists primarily of telling employees what work to perform, or where and when to perform the work, but not how to perform the work," the supervision does not support a joint employer finding. *Id.* (citing *Local 254, Serv. Emps. Intern. Union, AFL–CIO,* 324 N.L.R.B. 743, 746-49 (1997) (no joint employer relationship where employer regularly directed maintenance employees to perform specific tasks at particular times but did not instruct employees how to perform their work); *S. Cal. Gas Co.,* 302 N.L.R.B. 456, 461-62 (1991) (employer's direction of porters and janitors insufficient to establish joint employer relationship where employer did not, *inter alia,* affect wages or benefits, or hire or fire employees)). Here, Ward made the determination that Plaintiff should work in the mornings and occasionally directed Plaintiff to perform certain tasks. This limited direction does not support a joint employer finding and instead suggests that the relationship more closely aligns with a client-servant relationship than an employer-employee relationship.[3]

---

[2] Defendants argue that the FSAs, through a subcontract, define the terms and conditions of Plaintiff's assignment. (Memorandum of Law in Support of Defendants FedEx Freight Corporation and FedEx Freight, Inc.'s Motion for Summary Judgment, ECF No. 39, at 8.) The record is devoid, however, of any subcontract that is enforceable and applies to Bright Horizons during Plaintiff's term of assignment to NWB in 2011-2012. In fact, Lindberg testified as to only ever signing one subcontract, and such subcontract did not apply to the time period relevant here. (Pl.s 56.1, ¶ 13; Mullkoff Decl., Ex. 2, at 52:6-24; 90:3-91:18.) Thus, Bright Horizons and Plaintiff were not bound by the written terms of that subcontract, even if Lindberg believed—and the practical realities dictated—that the FSA between Brite Solutions and FedEx determined Bright Horizons' tasks and duties. The extent of FedEx's supervision and control of Plaintiff will therefore be analyzed on the basis of the parties' actions, because there is no applicable subcontract.

[3] Plaintiff additionally cites *Goodwin v. Orange & Rockland Utilities, Inc.* for the proposition that where "a company's employees 'spoke to [the plaintiff] regarding her performance on at least two occasions,' [this] was a

Finally, Plaintiff argues that "the particular sub-sections and detailed aspects of the FedEx policies pursuant to which Jenkins and other FedEx supervisors investigated Ms. Liotard's claims expressly apply only to employees." (Pl.'s Opposition, at 20.) The Court disagrees that this suggests Plaintiff is an employee of FedEx. First, Plaintiff wholly ignores that the policy itself is directed towards "all employees and other individuals providing services" to FedEx. (Saccomano Aff. Ex. L, at 59.) Though some of the more specific provisions only refer to employees, the overarching purpose of the policy clearly states that it is to apply to non-employees as well. Further, as the Court in *Washington v. ABM Janitorial Servs.*, explained:

> [A]s a matter of sound public policy, Plaintiff's position is untenable. Merely extending the protection of an anti-harassment policy to non-employees should not be enough to convert every non-employee of a company into an employee. If every employer ran the risk of a joint employer claim simply because it permitted non-employees to raise concerns under its anti-harassment policy—and despite all other evidence to the contrary—then no employer would extend protection to non-employees. The joint employer theory of liability surely was not intended to encourage employers not to extend non-employees protection from its employees' conduct in the workplace.

No. CIV.A. 11-6462, 2013 WL 6047494, at *7 (E.D. Pa. Nov. 15, 2013). Accordingly, the fact that FedEx's anti-discrimination policy was extended to cover Plaintiff's claim should not create an inference that Plaintiff was a covered employee and it therefore does not create a genuine issue of material fact as to whether FedEx was Plaintiff's joint employer. Though Plaintiff argues that the "full array of functional employment factors" create a genuine issue—which distinguishes this case from *Washington*, where the main inquiry was limited to the

---

factor in holding that a joint employment relationship existed as a matter of law)." No. 04 CIV. 0207 (WCC), 2005 WL 2647929, at *5 (S.D.N.Y. Oct. 14, 2005). In the instant case, however, there is no indication that Defendants ever discussed Plaintiff's performance with her, and therefore, if anything, this factor weighs against a joint employer finding.

discrimination policy—the Court fails to see any material "functional employment factors" and, more importantly, any indicia that FedEx maintained "immediate control" over the Plaintiff, as outlined more thoroughly above.

The result is the same under the NYHRL. "The state law defines an employer as any employer with four or more persons in his employ." *Goodwin*, 2005 WL 2647929, at *5 (S.D.N.Y. Oct. 14, 2005) (citing N.Y. Exec. L. § 292(5)). "In determining whether an entity may be considered an employer within the meaning of the NYHRL, the Court must analyze four elements: 1) whether the proposed employer had the power of selection and engagement of the employee; 2) whether the proposed employer made the payment of salary or wages to the employee; 3) whether the proposed employer had the power of dismissal over the employee; and 4) whether the proposed employer had the power to control the employee's conduct." *Goyette v. DCA Adver., Inc.,* 830 F.Supp. 737, 746 (S.D.N.Y. 1993) (citing *State Div. of Human Rights v. GTE Corp.,* 487 N.Y.S.2d 234 (App. Div. 4th Dep't 1985). The fourth factor is the "most essential factor in this analysis." *Id.* As explained in detail above, FedEx did not (1) select Plaintiff, (2) pay Plaintiff, (3) have the power to terminate Plaintiff, or (4) have the power to control Plaintiff's conduct. Thus, FedEx is not an employer within the meaning of the NYHRL.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of Court is respectfully requested to terminate the motion at ECF No. 36 and enter judgment for the Defendants accordingly.

Dated: March _17_, 2016                          SO ORDERED:
      White Plains, New York

                                                NELSON S. ROMÁN
                                       United States District Judge